**C.J. KREHBIEL COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Graphic Communications International Union, Local 508 O–K–I, Intervenor.**

**No. 86–1541.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 4, 1988.

Decided April 26, 1988.

Roger A. Weber, Cincinnati, Ohio, for petitioner.

Jesse Gill, Atty., N.L.R.B., Washington, D.C., for respondent. Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Howard E. Perlstein, Supervisory Atty., F.L.R.B., Washington, D.C., were on the brief, for respondent.

Thomas F. Phalen, Jr., Cincinnati, Ohio, for intervenor, Graphic Communications Intern. Union, Local 508, O–K–I, AFL–CIO.

Before WALD, Chief Judge, RUTH BADER GINSBURG and WILLIAMS, Circuit Judges.

Opinion PER CURIAM.

PER CURIAM:

This case arises from a certification election held at the C.J. Krehbiel Company, in which the Graphic Communications International Union, Local 508, O–K–I, AFL–CIO prevailed by a slim, two-vote margin. Following computation of the official tally, Krehbiel filed objections with the National Labor Relations Board Regional Director, claiming that a Union flyer had conveyed a false impression that the Board supported the Union, and asking the Board to set aside the outcome. Neither the Regional Director nor the Board on appeal accepted Krehbiel's view of the facts. The company now asks us to overturn the Board's determination. As we find that the Board did not abuse its discretion in overruling the petitioner's objections, we uphold its order requiring Krehbiel to recognize and bargain with the Union.

On April 18, 1985, the Union filed a petition with the Board, seeking a representation election among the production and maintenance workers at Krehbiel's Cincinnati factory. Subsequently Krehbiel and the Union filed a Stipulation to Certification Upon Consent Election and the Board scheduled a secret ballot election for June 20, 1985.

Because it provided an obvious benchmark by which the employees could judge the merits of the certification controversy, the status and viability of the Union at the nearby Neilsen Lithographing Company became a central matter of contention between Krehbiel and the Union in their efforts to sway the Krehbiel employees. During the election period, the Union led a

strike at Neilsen and filed unfair labor practice charges, alleging that Neilsen had refused to bargain in good faith. A few weeks before the election, Frank Bailey, one of Krehbiel's foremen, raised the issue of the Neilsen strike at a weekly employee meeting, and asserted that the striking Nielsen pressroom workers had been replaced. Joint Appendix (J.A.) 69–70. On June 8 the Union responded by distributing a letter from a Neilsen striker stating that the Union had continued to support the strikers during their unemployment and explaining the Union's position on the strike. J.A. 79. On June 18 Krehbiel mailed its reply, reiterating Bailey's assertion that some of Neilsen's employees had been replaced during the strike and that some had abandoned the strike. J.A. 24. On the same day, the Union distributed a campaign flyer (the "first flyer," attached as Appendix A) containing a photocopy of the remedy section of the Administrative Law Judge's opinion in the Neilsen matter (requiring Neilsen to reinstate 26 former strikers), surrounded in the margins by various cartoons and partisan exhortations. While distributed in envelopes bearing the Union's name, the flyer was not, on its face, identified as a composite of the Board's edict and Union-made embellishments. On June 19, the Union distributed a second campaign flyer (the "second flyer," attached as Appendix B), printed on Union stationery and also covered with partisan cartoons and slogans. The second flyer told employees that the first one had been mailed to them by the Union and described it as "an actual copy of a recommended notice issued by a N.L.R.B. Administrative Law Judge."

On the following day the Union won the certification election by two votes. (The initial tally was 66–65, but the Board voided one ballot contested by the Union.) Krehbiel filed objections, alleging that in distributing the first flyer the Union had given employees the false impression that the NLRB supported the Union. The Regional Director of Region 9 of the NLRB issued a report recommending that Krehbiel's objections be overruled, and the Board, by a two-to-one majority, adopted

the Regional Director's findings and recommendations and certified the Union as the employees' exclusive bargaining representative. *C.J. Krehbiel Company*, 279 NLRB No. 114 (1986) (*Krehbiel*).

In order to contest the Board's ruling, Krehbiel refused to bargain with the Union, prompting an unfair labor practice charge. The Board in turn issued a complaint alleging that Krehbiel had violated §§ 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5). Krehbiel, in its answer, admitted that it had refused to bargain with the Union, but asserted that the Union had not been properly certified as the employees' bargaining representative. On August 29, 1986, the Board granted a motion for summary judgment against Krehbiel, finding that the issues raised by Krehbiel "were or could have been litigated in a prior representation proceeding," and that Krehbiel had not tendered any "newly discovered and previously unavailable evidence" or alleged "any special circumstances that would require the Board to reexamine the decision made in the representation proceeding." J.A. 111. It then issued an order requiring Krehbiel to recognize and bargain with the Union. Krehbiel asks us to review and set aside the Board's order.

While this court has jurisdiction to review the Board's decision pursuant to §§ 10(e) and (f) of the Act, 29 U.S.C. §§ 160(e) and (f), the Board is entrusted with a wide degree of discretion in conducting representation elections. *Amalgamated Clothing Workers of America v. NLRB*, 424 F.2d 818, 826–28 (D.C.Cir.1970); *Amalgamated Clothing & Textile Workers v. NLRB*, 736 F.2d 1559, 1562 (D.C.Cir. 1984). The scope of our review of such decisions is narrow. To prevail before us, a party attempting to set aside a representation election must demonstrate that the conduct complained of interfered with the employees' exercise of free choice to such an extent that it materially affected the election. *Id.* at 1564. If we find that the Board's decision was supported by substantial evidence and conformed with Board precedent, we will defer to the Board. *Id.*

Krehbiel raises two related challenges to the Board's decision. First, it argues that the decision "depart[ed] from prior Board decisions without explanation." Petitioner's Brief at 30. Second, assuming *arguendo* that the Board did apply the correct legal test, Krehbiel asserts that the Board's determination is not supported by substantial evidence.[1]

### A. *Conformity With Precedent*

In *General Shoe Corporation*, 77 NLRB 124 (1948), the Board held that "laboratory conditions" must be maintained in labor election campaigns. Pursuant to this perhaps idealistic view of the certification process, *see NLRB v. ARA Services, Inc.*, 717 F.2d 57, 66 (3d Cir.1983) (*en banc*) ("given the nature of inter-employee relations, the Board cannot realistically be expected to create a totally frictionless election environment"); *see also NLRB v. Mar Salle, Inc.*, 425 F.2d 566, 571 (D.C.Cir.1970) (similar), the NLRB subsequently held that it would set aside any election in which the prevailing party reproduced and distributed a "document purporting to be a copy of the Board's official ballot, other than one completely unaltered in form and content and clearly marked sample on its face." *Allied Electric Products, Inc.*, 109 NLRB 1270, 1272 (1954). Although the Board occasionally strayed from this approach, *see, e.g., Associated Lerner Shops of America*, 207 NLRB 348 (1973); *Stedman Wholesale Distributors*, 203 NLRB 302 (1973), it generally applied the *per se* rule, and expanded its scope to encompass misuse by a party of any official Board document. *See, e.g., Rebmar, Inc.*, 173 NLRB 1434 (1968) (Board election notices); *Mallory Capacitor Co.*, 161 NLRB 1510 (1966) (unfair labor practice complaints); *GAF Corporation*, 234 NLRB 1209 (1978) (the Board's letterhead).

In 1982, however, the Board made a decisive break from the theory underlying its prior cases, asserting in *Midland National Life Insurance Co.*, 263 NLRB 127 (1982), that the voters were capable of evaluating the truthfulness of campaign materials. *Riveredge Hospital*, 264 NLRB 1094 (1982), followed on the heals of *Midland*, and extended *Midland*'s holding to parties' misrepresentations of Board actions. Finally, in *SDC Investment, Inc.*, 274 NLRB 556 (1985), the Board explicitly overruled the *per se* approach announced in *Allied Electric Products* in favor of a case-by-case approach focusing upon whether a party's use of a Board document was "likely to have given voters the misleading impression that the Board favored one of the parties to the election." *SDC*, 274 NLRB at 557.

Under the framework created in *SDC*, if campaign propaganda "on its face clearly identifies the party responsible for its preparation [it] ... will not serve as the basis for setting aside an election." *Id.* If, however, the source of the propaganda is not clearly identified on the face of the offending document, the Board will "examine the nature and contents of the material in order to determine whether the document has the tendency to mislead employees into believing that the Board favors one party's cause." *Id.*

■ Krehbiel does not directly dispute *SDC*'s applicability to the present case, but argues instead that the Board failed to apply *SDC* correctly. It claims that this can be demonstrated by comparing the facts and the Board's decision in the present case with decisions made in pre-*SDC* cases that *SDC* did not purport to overrule. *See* Petitioner's Reply Brief at 2 n. 1. Krehbiel's reliance on these former cases is misplaced. *Rebmar, Inc.*, 173 NLRB 1434 (1968), explicitly relied upon the *per se* analysis developed in *Allied Electric Products* and later overruled by *SDC*. In the other pre-*SDC* cases cited by Krehbiel, the Board analysed the offending

---

1. At oral argument Krehbiel asserted that in light of the closeness of the election the Board erred in refusing Krehbiel's request for a hearing. Krehbiel had not raised this issue in either its original or its reply brief, though in the latter it argued at 3–4 that the Board did not have enough information, given the lack of a hearing, to make any findings with respect to the employees' awareness of the Neilsen controversy. We decline to reach this issue as it has not been properly raised before us. *Carducci v. Regan*, 714 F.2d 171 (D.C.Cir.1983).

documents within the same now-abandoned framework. While Krehbiel is correct in its assertion that the Board in *SDC* did not intend to disapprove all pre-*SDC* decisions, it fails to recognize that in the older decisions specifically approved of in *SDC*, *Associated Lerner Shops of America*, 207 NLRB 348 (1973), and *Stedman Wholesale Distributors*, 203 NLRB 302 (1973), the Board panels had in practice disregarded the *per se* rule. The Board in this case quite plainly followed the analytic structure created in *SDC*. *See Krehbiel* at 2. The petitioner's claim that the Board departed unlawfully from past precedent is therefore without merit.

### B. *Application of the SDC Standard*

■ Krehbiel asserts that the campaign flyers distributed by the Union had "the tendency to mislead" voters and that the Board's decision to the contrary is not supported by substantial evidence. In reviewing the Board's decision, we are not called upon to decide the merits *de novo*, but rather to ascertain whether the Board could reasonably have drawn its conclusions from the record before it. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951). Here a one-vote switch would have altered the election's outcome. (In a tie the union loses for want of a majority. 29 U.S.C. § 159(a) (1982) ("Representatives designated or selected for the purposes of collective bargaining by the *majority* of the employees ... shall be the exclusive representatives.") (emphasis added); *see also NLRB v. Schapiro & Whitehouse, Inc.*, 356 F.2d 675 (4th Cir.1966); *NLRB v. Gentithes*, 463 F.2d 557 (3d Cir.1972).) If the flyers improperly influenced but one voter, their use impermissibly altered the election's result. Thus the case deserved especially careful scrutiny by the Board. *NLRB v. Gooch Packing Co.*, 457 F.2d 361, 362 (5th Cir. 1972) ("In close vote election situations the Board is required to particularly and carefully scrutinize charges which in other cases would constitute immaterial or insubstantial objections"); *see also NLRB v. Skelly Oil Co.*, 473 F.2d 1079 (8th Cir. 1973); *Henderson Trumbull Supply Corp.*

*v. NLRB*, 501 F.2d 1224 (2d Cir.1974). In the case before us the Board was less than forthright in failing to acknowledge the need for a more searching review.

Taking the first step of the *SDC* analysis, the Board found that, although the first flyer was mailed in an envelope bearing the Union's name, it was not on its face identified as originating from the Union. The Board therefore proceeded to the second step, analysing the nature and contents of the flyer to "determine whether the reproduced document [had] the tendency to mislead employees into believing the Board favor[ed] [the Union's] cause." *Krehbiel* at 2. As described by the Board, the first flyer "includes the caption and remedy section of an administrative law judge's decision ... [o]n the same page [with] a 5–inch 'crowing rooster,' the words, 'Vote Yes,' a box with an 'X' in it, and other partisan cartoons." *Id.* The Board relied on three factors in finding the flyer harmless.

First, it concluded that no "reasonable employee" would believe that an administrative law judge would embellish his decision with cartoons, slogans, and crowing roosters. *Krehbiel* at 3. Krehbiel disputes the Board's call on this question, pointing out that the Board does distribute documents and handbills decorated with slogans and cartoons, and arguing that employees cannot be assumed to know what an ALJ's decision normally looks like. The Union, as intervenor, attempts to demonstrate that the cartoons on the relevant flyer are significantly different from those traditionally used by the NLRB. Noting that we have before us the same record as that scrutinized by the Board, Krehbiel invites us to decide the question *de novo*. Petitioner's Reply Brief at 1. The argument has superficial force, as the Board held no hearing but merely evaluated the record now before us. We decline. We may reverse the fact findings of a district court—theoretically no more expert than ourselves—only when "clearly erroneous," and that deference is due regardless of whether credibility is at stake. Fed.R.Civ. P. 52(a); *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 105 S.Ct. 1504,

1512, 84 L.Ed.2d 518 (1985). Here, of course, the case for deference is stronger, as Congress has charged the Board, a special and expert body, with the duty of judging the tendency of electoral flaws to distort "the employees' ability to make a free choice." *Amalgamated Clothing & Textile Workers v. NLRB*, 736 F.2d at 1563–64.

We must note in passing, however, our puzzlement at the Board's reference to how a "reasonable employee" would read the materials here at issue. When the Board in *SDC* adopted the approach of reviewing misleading tendencies case-by-case, it was presumably inherent in that approach that it would consider the full context. Here that context quite obviously includes the one-vote margin by which the Union prevailed. Surely not all employees are equally astute in analysing the parties' promotional materials. Assuming variation, we are unclear why, in a close election, the Board need not inquire into the risk that distributed materials might mislead the less astute employees. Of course such a rule might in effect restore an approximation of the pre–SDC rule when an election was close; but that similarity is not, alone, much of an explanation for refraining from the inquiry. Here, in any event, Krehbiel did not focus exactly on the point, and the Board's opinion makes only one reference to the "reasonable employee." Accordingly the point is not a ground for reversal. At some time, however, the Board will doubtless wish to explicate its decision to apply a "reasonable employee" test in close elections, if that indeed is the test to which the Board adheres.

Second, the Board concluded that an employee would recognize that the ALJ opinion concerned the Neilsen dispute, would know that Neilsen was not a party to the upcoming election, and would therefore realize from the context that the partisan cartoons were distinct from the opinion. *Krehbiel* at 3. The Union argues that an employee reading the flyer would realize that it was sent by the Union to demonstrate the truth of the Union's assertions regarding the outcome of the Neilsen dispute. Assuming *arguendo* that all employees were able to make that connection, we are not convinced that all would conclude that the cartoons were the work of the Union. Once again, however, we cannot say that the inference accepted by the Board is unreasonable.

Finally, the Board noted that "the sheer physical size and placement of the cartoons and slogans on the leaflet support the conclusion that these items were additions made by the preparer of the flyer." *Id.* Although it is not beyond the realm of the possible that an ALJ might draw a 5-inch crowing rooster in the margins of his opinion, we agree that one viewing the cartoons in question would not be likely to conclude that they were an integral part of the opinion.

Thus we uphold the Board's determination that the first flyer, taken as a whole, was unlikely to mislead voters into believing that the NLRB advocated the Union's cause.

The second flyer was distributed the day before the election, on Union stationery, and identified the first flyer as "an actual copy of a recommended notice issued by a N.L.R.B. Administrative Law Judge." It also told the voters that "[t]he [previous] mailing came from the office of" the Union. In response to the assertion by a dissenting Board member that this second flyer implied that the first was an unaltered copy of an ALJ's opinion, the Board majority contended that the "latter document fully identified to employees that the [previous] flyer was union campaign propaganda." *Krehbiel* at 3–4. While the members of this panel are ourselves divided as to which inference is the more reasonable, we think it quite likely that the second flyer had no impact at all on the employees' understanding of the first. In any case, the majority did not rely on the second document to exculpate the first. Its characterization of the second document, even if unsound, does not fatally

undermine its decision as to the combined effect of the two.

\* \* \* \* \* \*

For the foregoing reasons, we uphold the decision of the Board and deny Krehbiel's petition for review.

# APPENDIX A

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES

THE NIELSEN LITHOGRAPHING CO.

and

GRAPHIC COMMUNICATIONS
INTERNATIONAL UNION, LOCAL 508,
O-K-I, AFL-CIO

JUN 17 1985

Case Nos. 9-CA-20474
. 9-CA-21292

### REMEDY

I credit the testimony of Theodore E. Murphy and Edwin J. Story that the employees went on strike on 26 January 1984 to protest Respondent's unfair labor practice of failing and refusing to disclose the financial data discussed above. The striking employees wore picket signs that stated that the strike was an unfair labor practice strike and the Union had filed an unfair labor practice charge with the Board.

Since the 26 employees who went on strike were unfair labor practice strikers they were entitled to reinstatement as of 25 July 1984 when Respondent admits they made an unconditional offer to return to work.

Respondent's failure to reinstate these unfair labor practice strikers as of 25 July 1984 is a separate unfair labor practice in violation of Section 8(a)(1) and (3) of the Act.

The remedy in this case should be as follows: Respondent should be ordered to cease and desist from engaging in its unlawful practices, it should be ordered to bargain in good faith with the Union, to include making suitable arrangements to turn over the requested financial and economic data which was the subject of this case, reinstate the employees to their former positions and pay them back pay with interest from 25 July 1984 to date.

 

VOTE
"YES"

**LOOK OUT FOR RUMORS**
spread by foremen and supervisors.

**LOOK OUT FOR SPECIAL MEETINGS CALLED BY THE BOSS.**

# APPENDIX B

**GRAPHIC COMMUNICATIONS INTERNATIONAL UNION**
LOCAL 508    O-K-I
2351 WEST McMICKEN AVENUE
CINCINNATI, OHIO 45214
(513) 621-3974

LOCAL 508   O-K-I

Dear Future G.C.I.U. Member

The mailing you recently received concerning Nielsen was an actual copy of a recommended notice issued by a N.L.R.B. Administrative Law Judge, Martin J. Linsky. The mailing came from the office of GCIU Local 508 OKI. The judge's recommendation is subject to review by the N.L.R.B. and a final order will be issued sometime in the near future.

Rumors Rodney

COMPANY RUMOR OF THE DAY

VOTING YES FOR THE UNION WILL RESULT IN YOUR LOSING HEALTH & WELFARE BENEFITS.

FACT:

NEGOTIATIONS BEGIN WITH WHAT YOU NOW HAVE. YOU CAN ONLY LOSE BENEFITS IF YOU VOTE TO GIVE THEM UP. (DO YOU HAVE THAT RIGHT, NOW?)

VOTE "YES"

BALLOT BOX

THIS IS NOT A CONTEST BETWEEN THE COMPANY AND UNION.

ONLY YOU THE EMPLOYEES OF C.J. KREHBIEL COMPANY WILL WIN OR LOSE!

Affiliated with American Federation of Labor/Congress of Industrial Organizations  •  Canadian Labour Congress

Uniting into one Graphic Communications union on July 1, 1983