ANTELOPE VALLEY BUS
COMPANY, INC.,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 00–1405.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 12, 2001.

Decided Jan. 4, 2002.

Gary C. Moss argued the cause for petitioner. With him on the briefs were Joanna S. Kishner and Celeste M. Wasielewski.

Christopher W. Young, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Arthur F. Rosenfeld, General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Robert J. Englehart, Supervisory Attorney.

Before: TATEL and GARLAND, Circuit Judges, and WILLIAMS, Senior Circuit Judge.[1]

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

Antelope Valley Bus Company petitions for review of a decision and order of the National Labor Relations Board (NLRB). The Board found that the company violated § 8(a)(5) and (1) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(5) & (1), by refusing to bargain with the Chauffeurs, Sales Drivers, Warehousemen and Helpers, Local 572, International Brotherhood of Teamsters, AFL–CIO. The Board had certified the union as the collective-bargaining representative of a group of Antelope Valley employees following an election conducted by mail ballot. The company alleges that the certification election was invalid because some employees in the bargaining unit did not receive their mail ballots, and that therefore its refusal to bargain with the union did not violate the NLRA. We deny the petition for review and grant the Board's cross-application for enforcement of its order.

## I

Antelope Valley operates a bus company that provides transportation for commuters, tours, and charters. The length of a bus driver's trip ranges from a few hours to two weeks or more. The buses are garaged at the company's facility in Sylmar, California, where employees report to check in, process paperwork, and obtain their buses. At the time of the contested election, the company employed approximately 149 drivers.

On August 23, 1999, the union filed an election petition with the NLRB, seeking to represent Antelope Valley's bus drivers. The parties entered into a stipulated election agreement, which specified that the balloting would be conducted by U.S. Mail. Pursuant to that agreement, Antelope Valley posted three standard election notices in the Sylmar dispatch area in early September, 1999. Each notice advised the employees that an election would be conducted by mail, and that "[a]ny person who has not received a ballot by Tuesday, September 28, 1999, should immediately contact the Election Unit, National Labor Relations Board, Region 31, [address and phone number], and request a ballot." Joint Appendix (J.A.) at 242.

The company provided the NLRB with a list, commonly referred to as an *Excelsior* list,[2] of the names and addresses of employees eligible to vote. The NLRB mailed ballots to those employees on September 17, using address labels provided by the company. The ballots were due on

---

**1.** Senior Circuit Judge Williams was in regular active service at the time of oral argument.

**2.** *See Excelsior Underwear Inc.,* 156 N.L.R.B. 1236 (1966).

October 13, and the NLRB counted them the next day. Of 149 eligible voters, 49 cast ballots in favor of representation by the union, and 46 cast ballots against the union.

Antelope Valley filed a timely objection to the election, alleging that four eligible employees—Barbara Cameron, Richard Guzman, Leo Molina, and Beverly Strong—did not receive ballots during the election period. After a hearing, an NLRB Hearing Officer rejected the company's allegations regarding the four employees, finding that each had had adequate notice and opportunity to vote. *Antelope Valley Bus Co.*, No. 31–RC–7776, slip op. at 14–15 (Jan. 20, 2000) ("Hearing Officer Op."). Thereafter, the Board adopted the findings and recommendations of the Hearing Officer and certified the union. *Antelope Valley Bus Co.*, No. 31–RC–7776 (Apr. 17, 2000) ("Board Certification Op.").[3]

Following certification, the union asked Antelope Valley to recognize it as the collective-bargaining representative for the unit and to begin bargaining. The company refused, and the union filed a charge with the Board. The NLRB's General Counsel then issued a complaint alleging that the company's refusal to bargain constituted an unfair labor practice in viola-tion of § 8(a)(5) and (1) of the NLRA.[4] In response, the company admitted its refusal to bargain, but argued that the refusal was not unlawful because certification of the union had been improper. The Board granted summary judgment in favor of the General Counsel, holding that Antelope Valley had violated the NLRA and ordering the company to bargain with the union upon its request. *Antelope Valley Bus Co.*, 331 N.L.R.B. No. 171 (2000).

Antelope Valley seeks review of the Board's final decision and order. It does not dispute that the use of a mail ballot was appropriate in this case. It contends, however, that the Board's refusal to overturn the election in light of the failure of four employees to receive ballots conflicts with prior NLRB precedent and is unsupported by substantial evidence. The company further contends that the Board should have used additional procedures to ensure that all eligible voters received their election ballots. We consider these three arguments below.

## II

Antelope Valley maintains that the Board misapplied its controlling precedents in rejecting the company's objection to certification of the union. We review Board decisions in part to determine

---

3. At the hearing, Antelope Valley also alleged that one employee, Garret Green, received a ballot too late to vote in the election. The Hearing Officer rejected that allegation on the ground that, inter alia, it was outside the scope of the objection filed by the company. Hearing Officer Op. at 16. The Board, however, found it unnecessary to pass on the allegation regarding Green: because the Board rejected the company's allegations concerning the other four employees, the allegation regarding Green could not affect the outcome of the election. Board Certification Op. at 2 n.1. We find it unnecessary to consider the claim regarding Green for the same reason.

4. Section 8(a) states, in relevant part:

   It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [NLRA § 7];
   . . .
   (5) to refuse to bargain collectively with the representatives of his employees. . . .
   29 U.S.C. § 158(a) (1994). NLRA § 7 guarantees employees "the right to self-organization, to form, join, or assist labor organizations, . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. . . ." 29 U.S.C. § 157 (1994).

whether "the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *International Union of Electronic, Electrical, Salaried, Mach. & Furniture Workers v. NLRB*, 41 F.3d 1532, 1536 (D.C.Cir.1994) (internal quotations omitted). The Board "cannot ignore its own relevant precedent but must explain why it is not controlling." *See B B & L, Inc. v. NLRB*, 52 F.3d 366, 369 (D.C.Cir.1995). However, it is not necessary for the Board to distinguish a precedent expressly if the grounds for distinction are readily apparent. *See Gilbert v. NLRB*, 56 F.3d 1438, 1445–46 (D.C.Cir. 1995).

In determining the validity of the election in this case, the Hearing Officer relied on the "adequate notice and opportunity to vote" test of *Lemco Construction, Inc.*, 283 N.L.R.B. 459, 460 (1987). In *Lemco*, the Board upheld an election notwithstanding that a number of eligible voters either did not go to the polls or arrived after the polls were closed. *Id.* at 459. "We will issue certifications," the Board held, "where there is adequate notice and opportunity to vote and employees are not prevented from voting by the conduct of a party or by unfairness in the scheduling or mechanics of the election." *Id.* at 460.

Antelope Valley argues that *Lemco* is an inappropriate precedent for this case, because it arose in the context of a challenge to a manual rather than mail ballot and because the challenge there did not involve nonreceipt of a ballot but rather the claim that too few eligible voters had voted for them to be considered "representative" of the entire unit. But there is nothing that compels the Board to restrict the *Lemco* test to the circumstances of that case. Nor is there anything unreasonable about the Board equating a failure to go to the polls with a failure to request a replacement mail ballot, and concluding that neither is sufficient to invalidate an election as long as the employee had adequate notice and opportunity to vote.

Antelope Valley contends that the precedent the Board should have applied is *Star Baking Co.*, 119 N.L.R.B. 835 (1957), a case in which the Board set aside an election because an employee whose vote could have been determinative did not receive a mail ballot. *Id.* at 836.[5] But the rule enunciated in *Star Baking*—that "it is the responsibility of the Board" to establish a procedure ensuring "that all eligible voters . . . be given an opportunity to vote," *id.*—is not inconsistent with the test enunciated in *Lemco*. The difference in the results of the two cases is instead readily attributable to differences in their facts. In *Star Baking*, the Board found that, having not received a mail ballot, the employee at issue did not have an adequate opportunity to vote; both parties agreed that it "was not feasible for him to vote manually" because the employee was stationed 45 miles from the polling place. *Id.* In this case, by contrast, the Board found that the four employees who failed to receive their mail ballots did have an adequate opportunity to vote; the stipulated election agreement gave them the option of requesting a duplicate mail ballot. In light of this clear distinction, the Board's refusal to set aside the Antelope Valley election as it did the *Star Baking* election was perfectly reasonable.[6]

---

**5.** Antelope Valley does not dispute that a disenfranchised employee's vote must be potentially determinative to justify setting aside an election, *see, e.g., Acme Bus Corp.*, 316 N.L.R.B. 274, 275 (1995), but argues that since the election at issue here was decided by three votes, the votes of the four employees could have changed the result. Pet'r Br. at 12 n.9.

**6.** The other cases cited more briefly by Antelope Valley, most involving manual ballots,

## III

Antelope Valley next argues that, even if the *Lemco* test were proper in this case, the Board erred in finding that the four employees had an adequate opportunity to vote. We review such a finding to determine whether it is "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e) (1994); *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951). In making that determination, we ask only "whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion," and in so doing we give "substantial deference to the inferences drawn by the NLRB from the facts." *Halle Enters., Inc. v. NLRB*, 247 F.3d 268, 271 (D.C.Cir.2001) (citations and internal quotations omitted).

The company contends that the four drivers who did not receive mail ballots did not have an adequate opportunity to vote because they did not have adequate notice of the availability of replacement ballots. This claim rings particularly hollow since the notice procedure was contained in an election agreement to which Antelope Valley stipulated, J.A. at 244, and because the company concedes that "the Notices were properly posted" pursuant to

that agreement, Pet'r Br. at 5. But even without the agreement, the company's claim is meritless. The notices were large (25½" by 14"), bold-blue posters, each with a banner reading "NOTICE OF ELECTION" running across the top. Antelope Valley does not suggest that the notices were unclear or difficult to understand, and concedes that they were placed in three locations frequented by the drivers: the window of the dispatcher's inner office, the counter used by the drivers to complete their paperwork in the dispatch office, and the door to the dispatch office. Indeed, it would have been hard for anyone leaving the dispatch office to have missed the latter notice, as it was tacked to the side of the door that the exiting employee had to push to leave the room. J.A. at 181–82.

Antelope Valley complains that placing the posters at the Sylmar facility was not sufficiently likely to result in notice because drivers were often away on road trips. But that theoretical objection has no place here: according to their own testimony, each of the employees was in the dispatch office at least twice during the month in which the notices were posted there. J.A. at 35, 54–56, 72–73, 107–08; *see* Hearing Officer Op. at 9. Even in a manual election it is not necessary to prove actual notice. Reasonable notice is suffi-

---

are also readily distinguishable as cases in which the employees were deprived of an opportunity to vote. *See, e.g., Wolverine Dispatch, Inc.*, 321 N.L.R.B. 796 (1996) (ordering a new election where no Board agent or ballot box was present at the polling place during part of the election period); *Whatcom Sec. Agency, Inc.*, 258 N.L.R.B. 985 (1981) (same where the doors of the polling place were locked for a substantial period of time and a large number of eligible voters did not vote); *Glenn McClendon Trucking Co.*, 255 N.L.R.B. 1304, 1304 (1981) (same where employee truck drivers "were prevented from voting" because they were on assignments "distant from the polling place" on the day of the

(manual) election); *B & B Better Baked Foods, Inc.*, 208 N.L.R.B. 493, 493 (1974) (same where Board agent opened polls "so late as to possibly disenfranchise" employees on an earlier shift); *Yerges Van Liners, Inc.*, 162 N.L.R.B. 1259, 1260–61 (1967) (same where potentially dispositive voter "had no opportunity to vote through no fault of his own" because he was away from the polling place on assignment); *see also Davis & Newcomer Elevator Co.*, 315 N.L.R.B. 715 (1994) (remanding where the Board failed to follow its rules and did not send a new ballot to an identifiable employee whose original ballot arrived at the NLRB in two pieces).

cient, and the Board's conclusion that the notice here was adequate is reasonable and supported by substantial evidence.[7]

Indeed, Antelope Valley's insistence on this argument is surprising because two of the four employees conceded that they *did* see the notice. One of the two, Richard Guzman, testified that he saw the notice in the dispatch office but did not read it. Although he knew that there was a mail ballot election in progress and realized (during the voting period) that he had not received a ballot, Guzman did not try to get a replacement ballot because he was "too busy." J.A. at 37. The other employee, Barbara Cameron, testified that she was in the dispatch office on an almost daily basis during the posting period, knew that there were "things" posted on the walls concerning the election, but did not read them. J.A. at 81–82. Like Guzman, Cameron knew that an election was being conducted by mail, and even called the company's Human Resources Department (still within the voting period) after she realized that she had not received a ballot. However, when Human Resources told her to call the NLRB, she chose not to, she said, because "that's not my job." J.A. at 86.

The company contends that it would be wrong to rely on such testimony to uphold

the election, given *Star Baking*'s admonition that it is the Board's responsibility—not the employees'—to ensure that all eligible employees have the opportunity to vote. But the Board's responsibility is only to ensure that employees have an *opportunity* to vote; it cannot ensure that any individual employee takes advantage of that opportunity. Even in manual elections, adequate notice of the time and place of voting is all the Board can require; it cannot force an employee to go to the polling place.[8] In this case, the Board provided those Antelope Valley employees who failed to receive mail ballots with the opportunity to vote by replacement ballot. It is true, as the company contends, that if such an employee failed to request a replacement ballot, he or she could not vote. But neither can an employee who, despite adequate notice, fails to go to a manual polling location. As the old adage goes, you can lead a horse to water . . .

## IV

Finally, Antelope Valley contends that the NLRB should have utilized additional "procedures to ensure that all eligible voters had received their election ballots." Pet'r Br. at 22. One possible procedure suggested by the company is the use of certified or registered mail. Antelope Val-

7. *See, e.g., Jowa Sec. Servs., Inc.*, 269 N.L.R.B. 297, 298 (1984) ("The Board has never required that employees receive *actual* notice of an impending election. Rather, the standard has always been that reasonable measures must be taken to assure that unit employees are aware of their right to exercise freely their franchise.... This is traditionally accomplished through the posting of the official notice of election in conspicuous places prior to the election.").

8. *See Lemco*, 283 N.L.R.B. at 460 ("The fundamental purpose of a Board election is to provide employees with a meaningful opportunity to [vote].... The law does not compel any employee to vote, and the law should not

permit that right, to refrain from voting, to defeat an otherwise valid election."); *see also Waste Mgmt. of Northwest Louisiana, Inc.*, 326 N.L.R.B. 1389, 1389 (1998) ("When an employee does not vote for reasons that are beyond the control of a party or the Board, ... the failure to vote is not a basis for setting aside the election."); *National Van Lines*, 120 N.L.R.B. 1343, 1346 (1958) (finding that employees' failure to cast valid ballots was not due to lack of "an adequate opportunity ..., but rather was occasioned by their lack of diligence and interest in mailing their ballots on a date which would have assured their timely receipt").

ley argues that the NLRB's failure to utilize such a procedure should invalidate the election, notwithstanding that the company—before it knew how the election would turn out—stipulated to an election agreement that did not contemplate the use of such a device.

This court is without authority to impose upon the NLRB the kind of election procedures that it may deem most appropriate. As the Supreme Court has repeatedly noted, "Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330, 67 S.Ct. 324, 327–28, 91 L.Ed. 322 (1946) (citing, e.g., *Southern S.S. Co. v. NLRB*, 316 U.S. 31, 37, 62 S.Ct. 886, 889–90, 86 L.Ed. 1246 (1942)).[9] For the reasons stated above, we conclude that the procedure employed in this case, a combination of mail ballots and notice of the opportunity to obtain replacements, was a reasonable method of ensuring the employees' right to a fair and free choice. Accordingly, we have no warrant for overturning it. *See B B & L*, 52 F.3d at 369 ("We will uphold the Board's exercise of discretion unless its action is unreasonable,

arbitrary or unsupported by the evidence."); *see also NLRB v. Wackenhut Corp.*, 471 F.2d 761, 762 (6th Cir.1972) (holding that the Board has discretion in adopting election procedures and refusing to require it to poll all employees to determine whether each actually received a mail ballot).[10]

Antelope Valley further contends that the Board erred in not vacating the election on the ground that the General Counsel failed to present testimony regarding the procedures the NLRB followed in preparing and mailing the ballots in this case—particularly testimony that the NLRB actually mailed the ballots to all employees on the *Excelsior* list.[11] But it is not the Board that bears the burden of demonstrating the validity of an election; rather, it is "the party challenging the results of a Board-certified election [that] carries a heavy burden" of showing the election's invalidity. *Kwik Care Ltd. v. NLRB*, 82 F.3d 1122, 1126 (D.C.Cir.1996); *see C.J. Krehbiel Co. v. NLRB*, 844 F.2d 880, 882 (D.C.Cir.1988). Petitioner cannot meet its burden of establishing that the NLRB failed to mail out the ballots by showing that the Post Office failed to deliver ballots to a small number of employ-

---

**9.** *See also Kwik Care Ltd. v. NLRB*, 82 F.3d 1122, 1126 (D.C.Cir.1996) ("As a general matter, the Board enjoys broad discretion in its administration of representation elections ...."); *C.J. Krehbiel Co. v. NLRB*, 844 F.2d 880, 885 (D.C.Cir.1988) ("The case for [judicial] deference is stron[g], as Congress has charged the Board, a special and expert body, with the duty of judging the tendency of electoral flaws to distort the employees' ability to make a free choice." (internal quotations omitted)).

**10.** In light of the replacement option provided in this case, we need not decide whether such an option is required for an election to be regarded as valid if a small but potentially dispositive number of employees fail to receive their initial mail ballots. *See J. Ray*

*McDermott & Co. v. NLRB*, 571 F.2d 850, 855 (5th Cir.1978) (stating, in a case in which there apparently was no such option, that "[i]t cannot be said that an election by mail is *per se* invalid whenever a potentially decisive number of votes, no matter how small, is lost through the vagaries of mail delivery").

**11.** The company also contends that the Hearing Officer improperly denied its request to see the NLRB's case file so that it could challenge the mailing procedures followed by the agency. Pet'r Br. at 25. Examination of the hearing transcript, however, reveals that Antelope Valley merely requested production of a list of those ballots actually received, and did not request access to the entire file. *See* J.A. at 15–16.

ees.[12] It certainly cannot do so in a case in which the Board received ballots back from two thirds of the eligible voters. As the Hearing Officer correctly stated, "[w]ithout more than a mere unsubstantiated or non-specific assertion of [NLRB] Regional misconduct, lost mail ballots in and of themselves do not rebut the presumption that the Region has performed as it should." Hearing Officer Op. at 13–14. To the contrary, in such circumstances, the few substantiated cases of nonreceipt are readily explained as the product of the "vagaries of mail delivery," rather than of a flaw in the NLRB's mailing procedures. *J. Ray McDermott & Co. v. NLRB*, 571 F.2d 850, 855 (5th Cir.1978).

Finally, we note that Antelope Valley's failure to satisfy its burden of proof distinguishes this case from a Sixth Circuit case repeatedly cited by the company. As Antelope Valley notes, in *NLRB v. Pinkerton's, Inc.*, 621 F.2d 1322 (6th Cir.1980), the court did remand for an evidentiary hearing to determine whether the NLRB actually sent ballots to all employees. In that case, however, the petitioner had established an unusual pattern of nondelivery—those who failed to receive ballots all lived in the same region—that made the court "particularly skeptical of the regularity of the Board's procedures." *Id.* at 1330. Antelope Valley established no similar ground for skepticism here. *See also id.* at 1324 (acknowledging that "[t]he party objecting to the validity of an election must bear the heavy burden of demonstrating by specific evidence that the election was unfair").

## V

We conclude that the Board's decision in this case was consistent with precedent and supported by substantial evidence, and that the election procedure it utilized was a reasonable method of ensuring the employees' right to a fair and free choice of their bargaining representative. Accordingly, we deny Antelope Valley's petition for review and grant the Board's cross-application for enforcement of its order.

---

**12.** Even the testimony of non-delivery was less than overwhelming. Three of the four employees testified that they did not collect their own mail, but rather let others pick it up for them while they were on the road. *See* J.A. at 40, 53, 62–63, 111–12.