# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 20, 2007          Decided July 27, 2007

No. 06-1160

SERVICE CORPORATION INTERNATIONAL, *D/B/A* OAK HILL
FUNERAL HOME AND MEMORIAL PARK,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

LABORERS' INTERNATIONAL UNION OF NORTH AMERICA,
AFL-CIO, LOCAL NO. 270,
INTERVENOR

———

Consolidated with
06-1201

———

On Petition for Review and Cross-Application for
Enforcement
of an Order of the National Labor Relations Board

———

*Nick C. Geannacopulos* argued the cause and filed the
briefs for petitioner.

*Amy H. Ginn*, Attorney, National Labor Relations Board,

argued the cause for respondent. With her on the brief were *Ronald E. Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Jill A. Griffin*, Attorney. *David A. Rosenfeld*, counsel for intervenor Laborer's International Union of North America, Local No. 270, joined in the brief of respondent.

Before: ROGERS, GRIFFITH and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: In its petition for review of a National Labor Relations Board ("Board") order, Service Corporation International ("SCI") challenges a representation election narrowly won by the Laborers International Union of North America, Local Union 270 ("Union"). SCI argues that the Union campaign used altered sample ballots that had "the tendency to mislead [its] employees into believing that the Board favor[ed the Union]." Petitioner's Br. at 14 (quoting *Sofitel San Francisco Bay*, 343 N.L.R.B. 769, 769 (2004)). We deny the petition and uphold the Board's order because it is supported by substantial evidence and is consistent with the Board's own precedent.

## I.

SCI does business under the name Oak Hill Funeral Home and Memorial Park in San Jose, California. As part of its campaign to organize SCI's maintenance employees, the Union sent between twenty and thirty pro-union flyers to their homes in the four months leading up to a July 16, 2004 representation election. The flyers were mailed in envelopes with a Union logo printed beside the return address. One flyer in particular, sent

several weeks before the election, included a sample ballot bearing the Board's seal in a Union envelope that also contained the business card of a Union organizer. The word "sample" was printed prominently across the ballot and a handwritten "X" had been placed in a box showing a vote for the Union. There were no markings on the face of the sample ballot to indicate its source.[1] During the campaign, SCI posted copies of the Board's standard Notice of Election in prominent spaces in and around its workplace.[2] The Notice explained that the Board "does not endorse any choice in the election" and warned that "any markings that you may see on any sample ballot . . . have been made by someone other than the . . . Board." SCI also held meetings with its employees to review the Board's sample ballot and to answer questions about the election and the materials they were receiving from the Union.

The Union carried the election by a vote of 23–20. SCI filed an objection to the election with the Board, arguing that the

---

[1] The Union later sent a second sample ballot to SCI's maintenance employees similar to the first, except that it included various express exhortations to vote for the Union. SCI raised no challenge to this sample ballot because there is no dispute that it was clearly identified as Union propaganda.

[2] The relevant portion of the Notice states, "**WARNING**: THIS IS THE ONLY OFFICIAL NOTICE OF THIS ELECTION AND MUST NOT BE DEFACED BY ANYONE. ANY MARKINGS THAT YOU MAY SEE ON ANY SAMPLE BALLOT OR ANYWHERE ON THIS NOTICE HAVE BEEN MADE BY SOMEONE OTHER THAN THE NATIONAL LABOR RELATIONS BOARD, AND HAVE NOT BEEN PUT THERE BY THE NATIONAL LABOR RELATIONS BOARD. THE NATIONAL LABOR RELATIONS BOARD IS AN AGENCY OF THE UNITED STATES GOVERNMENT, AND DOES NOT ENDORSE ANY CHOICE IN THE ELECTION."

first sample ballot the Union sent had the "tendency to mislead" SCI's employees into believing that the Board supported the Union. A hearing on SCI's objections was held in Oakland, California on September 10, 20, 21, and 22, 2004. In his report and recommendations to the Board, the hearing officer concluded that SCI's employees would know that the sample ballot was Union propaganda and would not mistake it for Board endorsement of the Union. The Board rejected SCI's challenge to the hearing officer's conclusions and certified the Union's victory. When SCI refused to bargain, the Union filed an unfair labor practice charge with the Board's General Counsel, who filed a complaint with the Board alleging that SCI had violated § 8(a)(5) and (1) of the National Labor Relations Act ("NLRA" or "Act"). In response to a motion for summary judgment, SCI admitted its refusal to bargain, but challenged the Board's certification of the election. The Board granted the motion in favor of the General Counsel and ordered SCI to bargain with the Union. *Service Corp. Int'l*, 346 N.L.R.B. No. 90, 2006 WL 1168862, at *1, 3 (Apr. 28, 2006). SCI now appeals that decision arguing that the Union's sample ballot tainted the election results.

## II.

We will uphold the Board's decision unless "upon reviewing the record as a whole, we conclude that the Board's findings are not supported by 'substantial evidence,' 29 U.S.C. § 160(e), (f)," *Int'l Union of Electronic, Electrical, Salaried, Mach. & Furniture Workers v. NLRB*, 41 F.3d 1532, 1536 (D.C. Cir. 1994), or that its interpretation of the Act is not "reasonable and consistent with applicable precedent," *Fashion Valley Mall, LLC v. NLRB*, 451 F.3d 241, 243 (D.C. Cir. 2006). When making decisions about representation elections, the Board is entitled to "a wide degree of discretion," *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330 (1946), which we grant so long as "the

Board has followed appropriate and fair procedures, and . . . has reached a rational conclusion concerning whether the atmosphere surrounding the election so attenuated free choice that a rerun election was necessary," *Amalgamated Clothing & Textile Workers Union v. NLRB*, 736 F.2d 1559, 1564 (D.C. Cir. 1984).

This deference is based, in part, on our recognition that Congress has given the Board responsibility to supervise representation elections, *Int'l Bhd. of Elec. Workers v. NLRB*, 417 F.2d 1144, 1146 (D.C. Cir. 1969), and authority to invalidate a result "if the actions of a party to the election reasonably tended to interfere with the employees' free and uncoerced choice in the election," *N. of Mkt. Senior Servs., Inc. v. NLRB*, 204 F.3d 1163, 1169 (D.C. Cir. 2000) (quotation marks omitted). Although none would dispute that elections should be held in "laboratory . . . conditions as nearly ideal as possible, to determine the uninhibited desires of the employees," *General Shoe Corp.*, 77 N.L.R.B. 124, 127 (1948), our deference to the Board in this area acknowledges "that union elections are often not conducted under ideal conditions, that there will be minor (and sometimes major, but realistically harmless) infractions by both sides, and that the Board must be given some latitude in its effort to balance the right of the employees to an untrammeled choice, and the right of the parties to wage a free and vigorous campaign," *NLRB v. Mar Salle, Inc.*, 425 F.2d 566, 571 (D.C. Cir. 1970) (quotation marks omitted); *see also Amalgamated Clothing*, 736 F.2d at 1562 ("[A]lthough the 'laboratory conditions' standard represents a noble ideal, it must be applied flexibly.").

When the Board concludes that an altered sample ballot used in a campaign for a representation election has a tendency to mislead employees into believing that the Board favors one of the parties in the election, it has held that the employees' right

to an untrammeled choice has been infringed and ordered new elections. *See Sofitel San Francisco Bay*, 343 N.L.R.B. at 771; *3-Day Blinds*, 299 N.L.R.B. No. 6, 1990 WL 122544, at *3-4 (July 20, 1990). The Board has created a two-part test for evaluating whether an altered sample ballot has the tendency to mislead employees into believing that the Board has a favored outcome. *See SDC Investment, Inc.*, 274 N.L.R.B. 556, 557 (1995). The Board first determines whether "an altered [sample] ballot . . . on its face clearly identifies the party responsible for its preparation." *Id*. If the source of the altered sample ballot is not clear from its face, "then the Board will examine the nature and contents of the document, as well as the circumstances of its distribution," *Kwik Care Ltd. v. NLRB*, 82 F.3d 1122, 1129 (D.C. Cir. 1996) (quotation marks and alterations omitted), to determine whether the document has "the tendency to mislead employees into believing that the Board favors one [of the parties to the election]," *SDC Investment, Inc*., 274 N.L.R.B. at 557. In addition, the Board has also considered whether employees had ample opportunity to become familiar with the Board's declaration of neutrality. *Kwik Care*, 82 F.3d at 1129-30. Because both sides in this dispute agree that the altered sample ballot did not, on its face, clearly identify who was responsible for its preparation and distribution, the only question for us is whether the altered sample ballot had the tendency to mislead SCI's employees into believing that the Board had taken the Union's side in the election.

The Board properly considered the nature and contents of the document, the circumstances of its distribution, and the employees' opportunity to become familiar with the Board's declaration, and determined that the altered sample ballot did not have the tendency to mislead SCI's employees. Looking to the nature and contents of the document, the Board found that the fact that the sample ballot was "off-center," contained "stray marks" characteristic of a photocopied document, and had only

a partial reproduction of the Board's disclaimer from the Notice of Election would lead a reasonable employee to think that the flyer was not an official Board publication. Regarding the extrinsic evidence of the flyer's source and distribution, the Board found that because it was mailed in a Union envelope with the business card of a Union organizer, and the employees had received twenty to thirty other mailings from the Union in a similar fashion (one of which was a second sample ballot that clearly identified the Union as its source), a reasonable employee would conclude that the flyer came from the Union. Moreover, the Board determined that SCI's employees had ample opportunity to familiarize themselves with the Board's declaration of neutrality. The Board's official Notice of Election with its neutrality declaration was prominently posted throughout SCI's facility, and SCI reviewed the sample ballot with the employees on several occasions prior to the election. In light of this substantial evidence, we conclude that the Board reasonably determined that the sample ballot did not have a tendency to mislead.

SCI repeats an argument to us that it made unsuccessfully to the Board—that the Board, by affirming the employees' election of the Union in the face of the altered sample ballots, has ignored its own precedent in *Sofitel San Francisco Bay*, a case SCI maintains is practically indistinguishable from this one. 343 N.L.R.B. 769. In *Sofitel*, the Board overturned a representation election because it determined that a marked sample ballot distributed by a union had the tendency to mislead employees into thinking that the Board supported the union position. SCI asserts that the sample ballot in *Sofitel* looked even less official than the ballot in

dispute before us.[3]

SCI is correct to point out that "[t]he Board cannot ignore its own relevant precedent but must explain why it is not controlling." *Antelope Valley Bus Co. v. NLRB*, 275 F.3d 1089, 1092 (D.C. Cir. 2002) (quotation marks omitted), but the Board has not ignored *Sofitel* and has adequately explained why it is not controlling here. The Board noted three ways in which the facts of *Sofitel* differ from the facts here. First, the physical appearance of the sample ballot in *Sofitel* contained no "words or markings" or other indications that it was a photocopy of another document. Second, there was no evidence in *Sofitel* that the "employees had ever seen, much less discussed with the employer, any sample ballots that contained the Board's disclaimer language." *Service Corp. Int'l*, 345 N.L.R.B. No. 35, 2005 WL 2102985, at *5 (Aug. 27, 2005). Finally, in contrast to the twenty to thirty other mailings sent by the Union here, the *Sofitel* sample ballot was the only piece of union propaganda that was sent or distributed to employees before the election. In light of these significant distinguishing features, we find that it was not unreasonable for the Board to reach a different conclusion here than it did in *Sofitel*.

We conclude that the Board's decision was supported by substantial evidence and consistent with precedent, and therefore we deny SCI's petition for review and grant the Board's cross-motion for enforcement.

---

[3] Unlike the Union's ballot here, the sample ballot in *Sofitel* did not include any part of the Board's neutrality disclaimer. On the *Sofitel* ballot the word "MUESTRA" (Spanish for "sample") was typed in large letters across the top, at the bottom the phrase "POR FAVOR–SI SE PUEDE" (Spanish for "Please–Yes it can be done") was handwritten in capital letters, and each potential voter's name was handwritten on the left side of the document.

9

*So ordered.*