# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 21, 2012        Decided March 23, 2012

No. 11-1104

HARD ROCK HOLDINGS, LLC, DOING BUSINESS
AS HARD ROCK HOTEL AND CASINO,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with No. 11-1133

———

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

———

*James Michael Walters* argued the cause for petitioner. With him on the briefs was *Brian Matthew Herman*.

*Barbara A. Sheehy*, Attorney, National Labor Relations Board, argued the cause for respondent. On the brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, *Ruth E. Burdick*, Supervisory Attorney, and *Richard A. Cohen*, Senior Attorney.

2

Before: ROGERS, *Circuit Judge*, and EDWARDS and GINSBURG, *Senior Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The National Labor Relations Board seeks enforcement of its order directing Hard Rock Holdings, LLC ("the Company") to bargain in good faith with Professional, Clerical and Miscellaneous Employees, Local 995, ("the Union") affiliated with the International Brotherhood of Teamsters, Local 995. The Company, in its petition for review, contests the Board's certification of the election in which the Union was named the bargaining representative of the Company's valet parking employees. In addressing the Company's objections, we clarify two points relating to stipulated bargaining units and the absence of pristine laboratory conditions during a representation election. First, the Board established the record of its analysis under the three-prong test of *Associated Milk Producers, Inc. v. NLRB*, 193 F.3d 539, 543 (D.C. Cir. 1999), necessary to support its conclusions regarding the parties' intent with regard to the stipulated bargaining unit. Extrinsic evidence relied on by the Company fails to demonstrate error. Second, the failure of the Board Agent to provide identification badges to election observers did not result in an unfair or invalid election in the absence of evidence that the failure materially affected the result of the election, and the Company offered no such evidence. The Board therefore acted within its discretion in sustaining the Union's challenges to the eight ballots cast by dual-rated bell-desk employees and in rejecting the Company's objections alleging misconduct by the Board's Agent. The Board thus is entitled to enforcement of its findings that the Company violated sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5) (2006) ("the Act"), by refusing to bargain with the Union. *See C.J. Krehbiel Co. v. NLRB*, 844 F.2d 880, 882 (D.C. Cir. 1988).

**I.**

The Company owns and operates a hotel and casino in Las Vegas, Nevada. In 2009, the Union sought to become the bargaining representative of the Company's parking valets. The dispute animating this appeal relates to the scope of the bargaining unit. Both parties agree that those employees working in the Company's valet-parking department are part of the unit. Their disagreement concerns whether employees who work primarily as bell-desk employees but who also work occasionally as valets — so-called "dual-rated" employees — are also members of the bargaining unit.

On September 25, 2009, the Union filed a representation petition with the Board. As opposed to proceeding to a hearing, the Company and the Union decided to stipulate certain issues, including the scope of the proposed bargaining unit. The record shows that Company and Union counsel had at least one brief conversation prior to the signing of the final stipulation agreement: counsel for the Company testified that he told counsel for the Union that the Company "did not want anybody excluded who parked cars." Hearing Transcript, *Hard Rock Holdings LLC*, Case No. 28-RC-6680, at 47 (Nov. 23, 2009). The Board's Agent faxed a proposed agreement to the Company's counsel on October 7, 2009, in which the voting unit was described as including "[a]ll full-time and regular part-time [v]alet [p]arking employees." NLRB Form, Stipulated Election Agreement, at 2. Company counsel telephoned the Agent to advise him that the Company would not agree to inclusion of the adjective "regular" and wanted all employees who ever parked cars to be part of the unit. The Agent then faxed Company counsel a revised agreement, already signed by the Union, in which the term "regular" had been eliminated. The revised description of the bargaining unit read: "All full-time and part-time Valet Parking employees." *Id.* Company counsel signed the agreement and faxed it to the Agent. The agreement was

approved the following day by the Board's Regional Director, and an election was scheduled for November 6, 2009.

Following the signing of the stipulation agreement, the Company submitted to the Regional Director a list of the names of those its viewed to be voting-eligible employees — the *Excelsior*[1] list. The Union did not object to the list, which included the names of the eight dual-rated employees. Just prior to the election, both Company and Union counsel signed the *Excelsior* list at a conference held by the Agent. During the election, the Union challenged the votes of the eight dual-rated employees.

Also, just before the start of the election, the Agent realized that he did not have enough identification badges for both the Union and Company observers. Rather than provide a badge to only one observer, the Agent testified that he decided to give none of the observers a badge. Neither the Company nor the Union contests the fact that the observers were not wearing identification badges during the election. The record indicates some dispute, however, about whether the Agent himself wore a badge identifying him as a government official.

During the election, one of the voters, a dual-rated employee ("the Voter"), engaged in a verbal exchange with the Agent shortly after a Union observer challenged the Voter's voting eligibility due to his status as a dual-rated employee. The level of altercation and nature of the words exchanged are disputed. The record is clear, however, that during the conversation, the Agent told the Voter to calm down or he might risk losing his job. The Voter testified that he had not known the Agent was a Board official until the end of the incident. Upon learning that the Agent was a government official, the Voter testified that he told the agent, "[t]hat's probably why you

---

[1] *Excelsior Underwear, Inc.*, 156 NLRB 1236 (1966).

5

and I got off to the wrong start." Hearing Transcript at 110. One voter was present during this incident and another was on his way out of the polling area.

At the completion of voting, the tallied results showed seventeen votes for and nine against Union representation with eight additional votes against the Union that it had challenged. The Company and the Union filed objections with the Board. A hearing was held regarding these objections and the Union's challenges to the votes of the eight dual-rated employees. The Hearing Officer recommended that the Board sustain the Union's ballot challenges, overrule the Company's objections, approve the Union's withdrawal of its objections, and certify the Union as the bargaining representative. Hearing Officer's Report on Objections & Challenged Ballots ("Hearing Report"), *Hard Rock Holdings LLC*, Case No. 28-RC-6680, at 27 (Dec. 29, 2009). The Board adopted the Hearing Officer's recommendations. Decision & Certification of Representative ("Certification Decision"), *Hard Rock Holdings LLC*, Case No. 28-RC-6680, at 1 (Sept. 28, 2010). To preserve its ability to appeal the certification, the Company refused to bargain with the Union. *See Boire v. Greyhound Corp.*, 376 U.S. 473, 477–78 (1964). A complaint was issued against the Company alleging its refusal to bargain violated the Act. On April 7, 2011, the Board issued its decision and order, granting summary judgment against the Company for violating section 8(a)(1) and (5) of the Act.

**II.**

The Company petitions for review of the Board's order on two grounds: first, it objects to the Board's sustaining of the Union's challenges to the eight ballots in view of the extrinsic evidence, and second, it maintains that the Agent's failure to provide observer badges impermissibly disrupted the election. In addressing these contentions, the court must determine

whether the Board abused its discretion. *See Serv. Corp. Int'l v. NLRB*, 495 F.3d 681, 684 (D.C. Cir. 2007); *Schoolman Transp. Sys., Inc. v. NLRB*, 112 F.3d 519, 521 (D.C. Cir. 1997). Our review of the Board's determination that a stipulated election agreement is ambiguous is *de novo*, *see Entergy Servs., Inc. v . FERC*, 568 F.3d 978, 982 (D.C. Cir. 2009), but the Board's factual determinations are conclusive if supported by substantial evidence on the record considered as a whole, 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 488 (1951). And the court will not reverse the Board's adoption of an administrative law judge's credibility determination unless it is "hopelessly incredible," "self-contradictory," or "patently unsupportable." *United Food & Commercial Workers Union Local 204 v. NLRB*, 447 F.3d 821, 824 (D.C. Cir. 2006) (quoting *Cadbury Beverages, Inc. v. NLRB*, 160 F.3d 24, 28 (D.C. Cir. 1998)).

## A.

In *Associated Milk*, the court clarified the analysis the Board must apply when faced with a stipulated bargaining unit agreement. First, the Board must determine whether or not the agreement's description of the bargaining unit is ambiguous. *Associated Milk*, 193 F.3d at 543. If no ambiguity exists, the Board must enforce the parties' agreement. *Id.* If the stipulation is ambiguous, however, the Board must apply ordinary principles of contract law in an attempt to determine the parties' intent. *See id.* at 543–44. At this stage, the Board may consider extrinsic evidence. *Id.* at 544. If, following this review, the Board concludes the parties' intent is still unclear, it must apply its traditional community-of-interests test. *See id.* at 543.

Here, the Board proceeded through each of these steps. First, it found that the scope of the unit as stated in the stipulated agreement was ambiguous: the wording was unclear as to whether the Company and the Union intended dual-rated employees to be included in the bargaining unit. The Board

observed that the stipulation's wording was "amenable to either interpretation" advanced by the parties. Certification Decision at 2. Second, the Board found that the extrinsic evidence failed to resolve that ambiguity: the record showed that, prior to entering into the stipulated agreement, Company and Union counsel had had one brief telephone conversation about the composition of the unit, a conversation in which they disagreed. Third, the Board determined under its community-of-interests standard that the dual-rated employees did not share a community of interest with the unit employees and so did not belong in the unit. In arriving at this conclusion, the Board relied on the evidence that (1) only one of the four dual-rated employees who testified had worked as a valet for more than a handful of shifts during the three months proceeding the election; (2) those four employee-witnesses could not recall any of the other four dual-rated employees ever working as valets more recently than two months prior to the election; and, (3) the dual-rated employees worked mainly as bell-desk employees and, as such, worked independently of valet-department employees, were supervised separately, and did not share in the valet tip pool (unless they worked as valets for an entire shift).

The Company does not specifically contest the Board's application of the first and third prongs of the *Associated Milk* analysis. Instead, the Company contends that the parties' intent was "easily discernable from a reading of available extrinsic evidence." Pet'r's Br. 11. The Company maintains that the Board "completely ignored the import of [its counsel's] unrebutted testimony that he communicated [the Company's] intention that it did not 'want anybody excluded who parked cars.'" Pet'r's Reply Br. 3. The Company next points to evidence that the Union did not object to the inclusion of the names of the eight dual-rated employees on the *Excelsior* list, but rather examined and signed a copy of the list prior to the election. In the Company's view, this failure to object to the *Excelsior* list was evidence of the Union's approval of the

named inclusions, for "[o]nly later did it become apparent that [the Union representative] had surreptitiously instructed [its] employee-observer to challenge any part-time valets who appeared at the NLRB polls to vote." Pet'r's Br. 14. Invoking sections 11084.2, 11095, and 11312.4 of the Board's Casehandling Manual, Part Two, Representation Proceedings ("the Manual"), the Company suggests that the Board's Regional Director would or should have revoked his approval of the stipulation agreement had he been aware that a substantial number of listed voters would be challenged. In any event, the Company concludes, the Union "should have been foreclosed from raising such tardy challenges to such a large portion of the electorate." Pet'r's Br. 15.

The Company fails to meet its burden to show that the Board abused its discretion in applying the second prong of *Associated Milk*. There was substantial evidence to support the Board's finding that the disagreement in the discussion of the stipulated unit by Company and Union counsel did not remove the ambiguity as to their intent regarding dual-rated employees. The hearing transcript showed that Company counsel's view of the unit was not the same as Union counsel's, and that during their brief conversation, the issue was not resolved. The Company also suggests that by agreeing to a revision of the stipulated agreement with the word "regular" removed, the Union assented to a definition of the bargaining unit that included the eight dual-rated employees. As with the conversations between the negotiators, however, this bargaining history is ambiguous. For instance, it may be that the Union interpreted the revised text as expanding the bargaining unit merely to include the on-call attendants, whereas the Company's interpretation of the draft agreement already included the on-call attendants and therefore removing the word "regular" from the agreement had the effect of adding the dual-rated employees to the unit. *See* Hearing Report at 13.

*Gala Food Processing, Inc.*, 310 NLRB 1193 (1993), on which the Company relies, is distinguishable. In that case, the employer claimed that the parties had intended to include some, but not all, of the call-in employees in the stipulated bargaining unit. *Id.* at 1193. The extrinsic evidence revealed just the opposite, however: during the stipulation negotiations, the employer proposed inclusion of the call-in employees in the unit and, prior to signing the stipulation, provided the names of *all* — not just some — of the call-in employees to the union. *Id.* Thus, the extrinsic evidence of the employer's own actions in negotiations contradicted the position it later took when challenging the election results. *See id.* The Board found this evidence "resolve[d] the ambiguity in the stipulation" and therefore rejected the employer's claim that the parties had intended anything else. *Id.* at 1193–94. No such extrinsic evidence exists to resolve the ambiguity here. The record does not suggest that either the Company or the Union switched its position from that taken prior to the signing of the stipulation agreement and the election; rather, the record shows disagreement, and hence ambiguity, regarding the scope of the bargaining unit throughout the negotiations and election. *Desert Palace, Inc.*, 337 NLRB 1096 (2002), on which the Company also relies, provides no support for its contention. *See id.* at 1097–1101.

Nor did the Board err in its consideration of the evidence regarding the *Excelsior* list. The Company's suggestion that the Union forfeited its right to challenge the ballots of the eight dual-rated employees by not protesting their inclusion on the *Excelsior* list is contrary to well-settled precedent: an employer's placing of a name on such a list does not establish that the parties intended the employee to be included in a stipulated unit. *NLRB v. Speedway Petroleum*, 768 F.2d 151, 157 (7th Cir. 1985); *Groendyke Transport, Inc.*, 204 NLRB 96, 98 (1973), *enforced* 493 F.2d 17 (5th Cir. 1974), *and overruled on other grounds by Monte Vista Disposal Co.*, 307 NLRB 531

(1992). Rather, an *Excelsior* list serves to advance the fair choice of bargaining representatives through "encouraging an informed employee electorate . . . by allowing unions the right of access to employees that management already possesses." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 767 (1969). As such, the Union's acknowledgment of the list was not tantamount to approval of the bargaining unit as constituting the employees whose names were on the list.

The Company's related argument that the Manual required the Union to object to the list or required the Regional Director to have processed the parties' stipulation differently fails to overcome that, as the Company conceded during oral argument, the Manual is staff guidance, not binding procedure, *Kwik Care Ltd. v. NLRB*, 82 F.3d 1122, 1126 (D.C. Cir. 1996); Oral Argument Tape at 8:12, and that the Manual itself states "it is the Board's decisional law, not the Manual, that is controlling," MANUAL, Purpose of the Manual. As noted, the Board has explained that a union's failure to object to an *Excelsior* list until the election does not result in a forfeiture of its right to challenge names appearing on the list. *Groendyke Transport*, 204 NLRB at 98; *see also Speedway Petroleum*, 768 F.2d at 157.

The Company's protest that had it known it would face a community-of-interest analysis, it might not have waived its right to a pre-election hearing, fails to show prejudice inasmuch as it acknowledges it had an opportunity to preserve its rights to a hearing and decided instead to forego that hearing as (presumably, so far as the record shows) a matter of litigation strategy. To the extent the Company suggests that it unfairly lost the benefit of its invocation of the Board-approved practice of stipulated bargaining unit agreements, it neglects to recognize that successful application of such practice rests on the existence of an unambiguous stipulation, an element found absent here. *See, e.g.*, *Kim/Lou, Inc.*, 337 NLRB 191, 191 (2001).

**B.**

The Company also contends that the Board erred in refusing to rule that the Agent's alleged misconduct — his failure to provide election observers with identification badges — tended to destroy the laboratory conditions necessary for a Board-conducted election. Indeed, the Manual states that "[i]t is required that all observers wear the official observer badge." MANUAL, § 11326.1. Deviations in election procedures involving observer badges, however, do not necessarily affect, much less undermine, the fairness of an election. *See NLRB v. First Union Mgmt., Inc.*, 777 F.2d 330, 335–36 (6th Cir. 1985); *L.C. Cassidy & Son, Inc. v. NLRB*, 745 F.2d 1059, 1063 (7th Cir. 1984). A deviation such as occurred here is not a *per se* ground for invalidation of an election. *Nabisco, Inc. v. NLRB*, 738 F.2d 955, 958 (8th Cir. 1984). Rather, the objecting party must show that such a deviation had a material effect on the election such as an impact on an individual vote. *See Serv. Corp. Int'l*, 495 F.3d at 684–85; *C.J. Krehbiel*, 844 F.2d at 882; *Nabisco*, 738 F.2d at 958. The Company offered no such evidence.

As an initial matter, the Board did not abuse its discretion in adopting the Hearing Officer's finding that the Agent reasonably exercised his professional judgment in deciding that neither the Company nor the Union observer should wear a badge when only one badge was immediately available. The Board could reasonably conclude that there was no evidence the absence of observer badges had any effect on the fairness and validity of the election. As to any confusion regarding the Agent's identity, the Board reasonably deferred to the Hearing Officer's conclusion that "[e]ven the witnesses who testified that they initially believed that the Board Agent represented the [Union] acknowledged that their doubts were erased after the Board Agent identified himself to them," Hearing Report at 24. Certification Decision at 1 n.1; *see also Nabisco*, 738 F.2d at 958. The Hearing Officer further found

that the Board Agent wore a badge identifying him as a "Government Official" during the entire election, a finding that is supported by substantial evidence.

The Company's challenge to the Board's overruling of its observer-badge objections is thus to no avail. The Company suggests that the Board mis-characterized or never addressed this argument, but the record is to the contrary. The Board reviewed the Company's challenges and the record and concluded that there was no basis for reversing the Hearing Officer's credibility findings regarding the observer badges. Certification Decision at 1 n.1. The Hearing Officer explained his findings were "compiled based on a synthesis of the credited testimony," and that "[t]o the extent that the facts differ[ed] from the testimony of a particular witness," he "discredited [that] testimony either because it was inherently inconsistent with credited facts or explicitly contradicted by the testimony of a credited witness or witnesses." Hearing Report at 21. The Company fails to show that the credibility determinations adopted by the Board were "hopelessly incredible," "self-contradictory," or "patently unsupportable," as would be required to overcome the deference otherwise owed to the Board. *See United Food & Commercial Workers Union*, 447 F.3d at 824.

The Board also reasonably determined that the Agent's actions in responding to the Voter did not amount to agent misconduct that tainted the election, as the Company contends. The credited evidence failed to establish that the Agent was responsible for the incident; rather, the Agent, upon identifying himself verbally as a government official present to conduct the election, "persuaded [the Voter] to calm down long enough to vote." Hearing Report at 24. After tensions eased, the Voter remained seated until he voted and then apologized to the Agent for his conduct as he was ushered out of the polling place. No evidence was presented that this incident impacted any

employee's ability to vote or otherwise compromised election results.

Accordingly, we deny the Company's petition for review and grant the Board's cross-application for enforcement of its order.