# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 23, 2012            Decided June 22, 2012

No. 11-1199

NATIONAL LABOR RELATIONS BOARD,
PETITIONER

v.

DOWNTOWN BID SERVICES CORPORATION,
RESPONDENT

INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE
WORKERS, DISTRICT LODGE 98,
INTERVENOR

———

On Application for Enforcement of an
Order of the National Labor Relations Board

———

*Bernard P. Jeweler* argued the cause and filed the briefs for respondent.

*Milakshmi V. Rajapakse*, Attorney, National Labor Relations Board, argued the cause for petitioner. With her on the brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Julie B. Broido*, Supervisory Attorney. *Renee D. McKinney*, Attorney, entered an appearance.

*Stefan P. Sutich* was on the brief for intervenor International Association of Machinists & Aerospace Workers, District Lodge 98 in support of petitioner.

Before: SENTELLE, *Chief Judge*, HENDERSON and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Opinion concurring in part and dissenting in part filed by *Chief Judge* SENTELLE.

Concurring opinion filed by *Circuit Judge* HENDERSON.

BROWN, *Circuit Judge*: The National Labor Relations Board seeks enforcement of an order finding Downtown BID, a non-profit business improvement corporation, committed an unfair labor practice (ULP) when it refused to bargain with the International Association of Machinists and Aerospace Workers (the Union) following an employee election. Downtown BID (the Company) contends agents or supporters of the Union unlawfully threatened and harassed employees and otherwise engaged in electioneering that interfered with the fairness and outcome of the election. The Board overruled these objections and certified the Union. Because the Board's findings and conclusions are supported by substantial evidence and consistent with Board precedent, we grant the Board's application.

I

Around March 2009, in response to an initial overture by employee Jennings Brown, the Union began an organizing campaign to represent the Company's approximately 117 safety and maintenance workers (SAMs). Union officials,

including Roosevelt Littlejohn, the Union's business representative and the main organizer of the Downtown BID campaign, solicited union authorization cards from the SAMs. Littlejohn also held six open informational meetings where he presided alone, discussing the Union and answering questions. Starting in June, Brown and several of his co-workers volunteered to support the Union, joined an organizing committee, and began to solicit authorization cards as well. Still, all of the Union's literature and all of the authorization cards were drafted by Littlejohn and had only Littlejohn's name and contact information on them.

Brown and some of his Union-supporting co-workers soon took the campaign in an aggressive and deeply troubling direction. In separate incidents, a few of these pro-Union employees threatened several of their co-workers, telling them they would be fired if they did not support the Union. Some of those employees were so disturbed by these threats that they contacted the Company's administrative department; the Company reassured them that neither Brown nor the Union could get them fired and that no one would be fired based on the outcome of the election. Some pro-Union SAMs also harassed co-workers with profanity and racial epithets, though one of those harassed also testified such language was unfortunately not uncommon in the workplace. Finally, a poster in an employee locker room was anonymously defaced with profane and racist language. According to Littlejohn, neither he nor the Union had any knowledge that employees were campaigning for the Union in an aggressive or harassing manner. He also had no knowledge of the threats of job-loss, and emphasized—credibly, in the ALJ's estimation—that such conduct was not authorized or approved by the Union.

When voting ultimately took place that July, Brown was selected by the Union as its election observer—simply

because, as Littlejohn testified, "[w]e couldn't get anybody else." ALJ Hearing Tr. at 248. Brown greeted voters and approached one as if to embrace him or her, but he was admonished not to by the Board's election observer and returned to his seat. One other potential voter was reported to have turned and left once he saw Brown in the room, and another employee also testified she received a "severe look" from Brown, though she voted freely anyway. *Id.* at 154, 158–60. Brown also took a phone call during a break in the voting and identified the Company's observer by name to the person with whom he was speaking. When the voting ended, 56 ballots had been cast in favor of the Union and 51 against the Union. There was one challenged ballot that was not resolved.

The Company timely filed objections to the election, arguing that the narrow victory was the result of threats, harassment, and unlawful electioneering by Brown and his cohorts. An ALJ heard two days of testimony in March 2010, after which he recommended that the Board overrule all of the Company's objections and certify the Union. The Board adopted the ALJ's findings and certified the Union on December 23. *Downtown BID Servs. Corp.*, Case 5-RC-16330 (N.L.R.B. Dec. 23, 2010) ("Election Decision").

The Union requested bargaining and the Company refused. This move by the Company sets up judicial review of an election certification that is otherwise insulated from direct review. *Boire v. Greyhound Corp.*, 376 U.S. 473, 476–77 (1964) ("Board orders in certification proceedings . . . are not directly reviewable in the courts . . . [but are instead] normally reviewable only where the dispute concerning the correctness of the certification eventuates in a finding by the Board that an unfair labor practice has been committed . . . ."); *Hard Rock Holdings, LLC v. NLRB*, 672 F.3d 1117, 1120

(D.C. Cir. 2012). In due course, a complaint was issued against the Company for its refusal to bargain, 29 U.S.C. § 158(a)(5), and the Board, rejecting the Company's claims that the Union had been wrongfully certified, found on April 4, 2011 that the Company committed the ULP as charged and ordered the Company to recognize and bargain with the Union.[1] *Downtown BID Servs. Corp.*, 356 N.L.R.B. No. 130 (Apr. 4, 2011) ("ULP Decision").

The Board now seeks enforcement of that April 4 Order. Because the Company does not deny its refusal to bargain, the validity of the Order turns on the validity of the representation election. The scope of our review of the Board's rulings regarding the election is "extremely limited," *Amalgamated Clothing & Textile Workers Union v. NLRB*, 736 F.2d 1559, 1564 (D.C. Cir. 1984), and we must respect the Board's "broad discretion" to assess representation elections, *AOTOP, LLC v. NLRB*, 331 F.3d 100, 103 (D.C. Cir. 2003). If the Board's decision to certify a union is consistent with its precedent and supported by substantial evidence in the record, we may not disturb it. 29 U.S.C. § 160(e); *see Pirlott v. NLRB*, 522 F.3d 423, 432 (D.C. Cir. 2008).

II

The Board applies a different standard when it reviews the misconduct of a union agent acting within the scope of his agency relationship than when it reviews either misconduct

---

[1] "A violation of Section 8(a)(5) [of the National Labor Relations Act] is also a violation of Section 8(a)(1), which makes it an unfair labor practice for an employer to 'interfere with, restrain, or coerce employees in the exercise' of their statutory right to bargain collectively through representatives of their own choosing." *S. Nuclear Operating Co. v. NLRB*, 524 F.3d 1350, 1356 n.6 (D.C. Cir. 2008).

that occurred outside any such relationship or misconduct of a third party. The first question to address is thus whether Brown or any of his aggressive colleagues were agents of the Union and, if so, what the scope of that agency relationship was.

Agency status is determined by common law agency principles. *Mar-Jam Supply Co.*, 337 N.L.R.B. 337, 337 (2001). As at common law, an agency relationship exists when a person has either actual authority or apparent authority to act on behalf of a union. *Id.* The agency relationship, established in either manner, "must be established with regard to the specific conduct that is alleged to be unlawful." *Cornell Forge Co.*, 339 N.L.R.B. 733, 733 (2003).

The Company claims Brown and his colleagues had actual authority to act for the Union because they solicited authorization cards on the Union's behalf. Under the Board's decision in *Davlan Engineering*, 283 N.L.R.B. 803, 804 (1987), "employees who solicit authorization cards should be deemed special agents of the union for the limited purpose of assessing the impact of statements about union fee waivers or other purported union policies that they make in the course of soliciting." The Company is therefore correct that Brown and his colleagues were agents of the Union, but the purpose and scope of their agency relationship is limited to their statements regarding "purported union policies" made in the course of soliciting. *Id.* The name-calling, profanity, and other generally reprehensible behavior of which they are guilty were unrelated to the subject matter of the authorization cards. The Board was therefore justified in concluding those were outside the scope of the agency relationship.

The Board also concluded that the job-loss threats made by Brown and others did not reasonably represent "purported union policies" and were therefore outside the scope of the agency relationship as well.[2] Although the Company has the exclusive authority to fire people, the record shows a few employees were not so sanguine. The Company claims some SAMs may not have known this basic fact because they are "not schooled in union matters," Resp't Br. 35, but an inference is not evidence. Moreover, those SAMs who took the job-loss threats seriously apparently asked for and received assurances from the Company that no one would be fired whatever the outcome of the election.

While we in no way condone the tactics in which Brown and his colleagues engaged, we cannot say the Board exceeded its discretion or acted inconsistently with its precedents by placing the responsibility of evaluating the plausibility of statements and threats on employees and by concluding, based on the circumstances in this case, that the impulsive statements of pro-Union employees could not reasonably be equated with Union policy. The Board's conclusion is bolstered by the fact that nothing in the record suggests either the Union or Brown and his colleagues had special leverage with the Company that would permit them to effectuate these threats. *Cf. Janler Plastic Mold Corp.*, 186 N.L.R.B. 540, 540 (1970) (rejecting an employer's objection that union threats of job-loss tainted an election because "no evidence was offered to show that any employee had reason to believe that the [e]mployer favored [the union] [or] . . . was disposed to discharge any employees for voting *against* [the

---

[2] The Board also noted that the record does not show that Brown and his colleagues made the job-loss threats "when they were soliciting authorization cards." Election Decision, at 2. We do not rely on this finding.

union]"); *compare Serv. Emp. Int'l Union Local 87*, 322 N.L.R.B. 402, 407 (1996) (finding a union to be responsible under *Davlan* for job-loss threats made by a *supervisor* soliciting signatures for the union when that supervisor "had the authority to hire, assign, and responsibly direct employees").[3] The Board's characterization of the job-loss threats recounted here is thus consistent with prior precedents, *see HCF, Inc.*, 321 N.L.R.B. 1320, 1320 (1996); *Holland Indus., Inc.*, 284 N.L.R.B. 739, 739 (1987), so we cannot say the Board was unjustified in finding they fell outside the scope of the *Davlan* agency relationship.

Because the Board's conclusion relating to the job-loss threats is "reasonable, consistent with its prior decisions, supported by substantial evidence, and consistent with common law determinations on similar facts," we cannot disturb it. *Overnite Transp. Co. v. NLRB*, 140 F.3d 259, 265 (D.C. Cir. 1998). Though Brown and his colleagues were agents of the Union under *Davlan* when they solicited authorization cards, that agency relationship was limited to statements made about Union policies and therefore did not cover "the specific conduct that is alleged to be unlawful." *Cornell Forge Co.*, 339 N.L.R.B. at 733.

The Company raises two additional agency-related arguments regarding only Brown. First, the Company argues Brown had apparent authority to act for the Union. Apparent authority "exists where the *principal* engages in conduct that[,] reasonably interpreted, causes the third person to

---

[3] In *Service Employees International Union Local 87*, the Board adopted the ALJ's decision, but because no party had filed substantive exceptions to that decision, 322 N.L.R.B. at 402 n.1, the Board's adoption is not considered precedential, *Stanford Hosp. & Clinics v. NLRB*, 325 F.3d 334, 345 (D.C. Cir. 2003). We refer to it only to highlight the difference from the context of this case.

believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Overnite Transp. Co.*, 140 F.3d at 266 (emphasis added). "[W]hile it may be the case that several employees . . . believe [a co-worker] acted on behalf of the union, the union cannot be held responsible for [his] conduct [when] it did nothing to confer apparent authority on him." *Id.* Though it is quite clear that many SAMs thought Brown represented the Union—and that Brown may have fancied himself a Union representative— there was sufficient evidence in the record for the ALJ and the Board to conclude that the Union never engaged in any conduct that would reasonably create that impression. The Union never held out Brown as its representative; by contrast, the Union held out Littlejohn, its own organizer, as its duly authorized representative. It was Littlejohn, not Brown, who personally created and initiated the distribution of leaflets and authorizing cards. Those cards bore Littlejohn's name and telephone number, not Brown's, thus indicating to employees that he was the sole contact person for the Union. Finally, Littlejohn, not Brown, arranged and presided over informational meetings, alone in front of an audience of SAMs which often included Brown.

This case is distinguishable from the case on which the Company primarily relies. In *NLRB v. Kentucky Tennessee Clay Company*, an apparent agency relationship was found to exist where the union "placed the lion's share of the organizing work upon" and relied "squarely and exclusively" on two employees to carry the union's message. 295 F.3d 436, 442–46 (4th Cir. 2002). In that case, "there was no evidence that [the union representative] or any other professional organizer ever obtained a single signature on an authorization card, attempted to visit the facility or to speak to employees on its outskirts, handed out a single pamphlet, or attempted to initiate contact with a single employee beyond

those present at the three organizational meetings." *Id.* Here, by contrast, the Union was far more directly involved: Littlejohn did all the organizing work. It therefore cannot be said that anything the Union did or did not do created the appearance of an agency relationship with Brown. In fact, we have even held that a union can leave it to employees to draft leaflets themselves without creating an apparent agency relationship. *Amalgamated Clothing & Textile Workers Union*, 736 F.2d at 1565. Since Brown did not even do that much independent work on behalf of the Union, it was consistent with precedent for the Board to find that Brown did not have apparent authority to act for the Union.[4]

Second, the Company argues Brown had actual authority to act for the Union because he was the Union's election observer. *See Detroit East, Inc.*, 349 N.L.R.B. 935, 936 (2007) ("It is well settled that election observers act as agents of the parties that they represent at the election."). This is not altogether wrong, but it suffers from the same flaw as the *Davlan* argument: that position did not make him an agent of the Union for every purpose. Brown was an agent of the Union only with respect to his conduct as an election monitor. *Cornell Forge Co.*, 339 N.L.R.B. at 733; *see also Brinks, Inc.*,

---

[4] The Company also emphasizes that Brown was part of an in-plant organizing committee, but we have squarely held that "the fact that [employees] were members of the Union Organizing Committee, alone, is not sufficient to confer apparent authority on them." *Overnite Transp. Co.*, 140 F.3d at 266; *see also Amalgamated Clothing & Textile Workers Union*, 736 F.2d at 1565 (noting that "[t]o hold that the [organizing committee] members were union agents would be in effect to penalize the union for conduct that it has little or no power to prevent" and finding no agency relationship). The Company's attempt to distinguish these cases relies on the assumption that the Union was absent from the process—an assumption we reject.

331 N.L.R.B. 46, 46 (2000) (assessing election monitor's agency relationship "at the time of his misconduct"). The job-loss threats and general aggression and harassment at the center of this case are both distinct from Brown's conduct as an election monitor; they are therefore outside the scope of that agency relationship.[5]

For these reasons, we accept as consistent with precedent and supported by substantial evidence the Board's conclusion

---

[5] The Company claims that, in the course of his election monitoring duties and therefore within his agency relationship, Brown engaged in unlawful electioneering when he greeted and started to hug some voters. But we have enforced the Board's conclusion on similar facts that "thumbs-up gestures by themselves were not a ground upon which to overturn the election." *U-Haul Co. of Nev., Inc. v. NLRB*, 490 F.3d 957, 964 (D.C. Cir. 2007). In addition, the Company notes that one SAM testified she felt unsettled by Brown's "severe look," but she was clear that it did not sway her vote. ALJ Hearing Tr. at 154, 158–60. The ALJ also heard an unsubstantiated report that a SAM turned and left the voting area when he saw Brown in the room. "The Board has repeatedly declined to impose a zero-tolerance rule on voting-day electioneering," *Family Serv. Agency San Francisco v. NLRB*, 163 F.3d 1369, 1381 (D.C. Cir. 1999), so the Board asks whether Brown's conduct as an election monitor "substantially impaired the exercise of a free choice so as to require the holding of a new election," *Boston Insulated Wire & Cable Sys. v. NLRB*, 703 F.2d 876, 881 (5th Cir. 1983). These "incidents"—a "look" that did not sway a vote and an uncorroborated statement that someone left the voting area upon seeing Brown—hardly meet this standard, so the Board's conclusion that a do-over was not warranted is supported by substantial evidence. Finally, the Company also complains that Brown identified the Company's election monitor by name on a phone call he took in the voting area, but it never explains why this was even inappropriate nor how it could have "substantially impaired" free choice or the validity of the election.

that the conduct to which the Company primarily objects took place outside of any agency relationship with the Union.

## III

Because the Board was justified in concluding that neither Brown nor any of his colleagues acted as agents of the Union when they threatened and harassed their fellow employees, those actions are evaluated under the standard applicable to third-party conduct. The Board will not set aside an election based on third-party misconduct unless that misconduct was "so aggravated as to create a general atmosphere of fear or reprisal rendering a free election impossible." *Westwood Horizons Hotel*, 270 N.L.R.B. 802, 803 (1984). Specifically, the Board considers: (1) the nature of the threat, (2) whether the threat was directed at an entire unit, (3) the extent of the dissemination of the threat, (4) whether the person making the threat was capable of carrying it out (and whether employees likely acted on that fear), and (5) whether the threat was made near the time of the election. *See id.*

The job-loss threats were serious, but they were only directed at and disseminated to a few individuals. The record reveals that, of the 117 SAMs in the unit, six were subjected to job-loss threats in separate incidents, some of which occurred at least a month before the election. At the earliest of these incidents, three SAMs were present to overhear the threat. The Company argues that, because the election was so close, this small number of affected voters would have been enough to tip the scale. But the inquiry for third-party misconduct focuses more broadly on the "general atmosphere" of the election, and the small number of affected employees suggests that the atmosphere was not the sort that would make a free election "impossible." *See id.* In any

event, even if those factors militated slightly in favor of re-running the election, we would still defer to the Board's decision because the remaining factors so clearly negate the existence of a general atmosphere of fear. The Company's reassurances were sufficient to dissipate any threat.

Indeed, the Board has held that even job-loss threats from union representatives *themselves* would not necessarily void an election because such a threat would, in the ordinary circumstance, be "illogical": "employees could be expected to conclude that the Employer would not fire employees who aided its cause" by voting against representation. *Underwriters Labs., Inc.*, 323 N.L.R.B. 300, 302 (1997), *enforced*, 147 F.3d 1048 (9th Cir. 1998); *see Janler Plastic Mold Corp.*, 186 N.L.R.B. at 540 (finding job-loss threats from a union unobjectionable); *compare Lyon's Rest.*, 234 N.L.R.B. 178, 179 (1978) (finding that a reasonable person could have believed threats of job loss because a unique "prior bargaining history between the [e]mployer and [the union's] sister local [union]" meant that the threats "carried a sufficient ring of plausibility"). Coming from third parties, such threats represent an even smaller contribution to an atmosphere of fear. The Board's conclusion that the job-loss threats did not sufficiently taint the voting atmosphere is therefore one that is consistent with its precedents and one to which we must defer.

The remaining harassment also does not rise to the demanding level necessary for us to conclude the Board erred. Name-calling, the use of racial epithets, and the anonymous defacement of posters with bigoted and threatening language are deplorable, but these isolated incidents do not warrant setting aside the election under either the Board's precedents

or our own.[6] *See Benjamin Coal Co.*, 294 N.L.R.B. 572, 573 (1989) (certifying election because "[t]he Union did not . . . either in its campaign literature or through the conduct of its five full-time staff organizers working on the campaign, either echo or condone these highly offensive sentiments"); *El Fenix Corp.*, 234 N.L.R.B. 1212, 1213–14 (1978) (certifying election when there was no evidence that the Union made or endorsed racial slurs); *see also Amalgamated Clothing & Textile Workers Union*, 736 F.2d at 1568 (finding the Board's decision not to overturn an election based on anonymous incidents was within its discretion because ordering a rerun election on that basis would "risk futility" and would "be devastatingly unfair to the majority of employees who have voted for the union"). To be sure, no employee should be bullied or suffer vicious and racially charged attacks in the workplace, but the Board's assessment that the general atmosphere at the Company did not render a free election "impossible," *Westwood Horizons Hotel*, 270 N.L.R.B. at 803, is consistent with its precedents and supported by substantial evidence in the record.

IV

Given the high level of deference we owe to the Board's assessment of the facts and of an election atmosphere, we find the Board properly certified the Union as the employees' representative. The Board was justified in concluding that the misconduct of a few pro-Union employees was not

---

[6] In addition, one employee gave conflicting testimony as to whether she was isolated from her work team because she would not support the Union. She also said she witnessed Brown pressuring an employee to sign an authorization card, but the supposedly pressured employee never corroborated this testimony. Even apart from the questionable evidentiary value of these statements, they do not warrant setting aside the election.

attributable to the Union. There is also substantial evidence to support the Board's finding that the various forms of misconduct were not sufficiently pervasive or threatening to invalidate the representation election. The Company's subsequent refusal to bargain was therefore unlawful, so we must enforce the Board's order.

*So ordered.*

SENTELLE, *Chief Judge*, concurring in part and dissenting in part: While I concur in the conclusion and most of the opinion of the court, I write separately to express my misgivings over the extension of what I think is already a dangerous and mistaken line of precedent with respect to the Board's ascertainment of the existence of an agency relationship. The idea that the existence of an agency relationship can be determined by the reasonableness of the representation made by the possible agent seems to me wholly illogical. There seems to me to be no inherent reason why actual agents could be presumed to say only reasonable things and self-appointed agents could be presumed to say unreasonable ones. Further, as applied to this case, the Board seems hardly consistent in its analysis. The evidence before the Board, and indeed accepted by the Board, supported the proposition that some employees were so convinced of the reasonableness of the proposition that the union could get them fired that they sought reassurance from management. The record does not reveal and could never reveal how many other employees may have heard the statements but not sought reassurance. Indeed, to ask that question is rather like inquiring of a spelunker as to how many miles there are of unexplored caves. But whether one assumes that the unsophisticated worker could be deceived by the lack of reasonableness so apparent to the Board would appear to me to be a question of the effect of the representation, not its apparent authorization by way of agency.

Neither do I think the result in this case is compelled by *Amalgamated Clothing & Textile Workers Union v. NLRB*, 736 F.2d 1559, 1565 (D.C. Cir. 1984). That case, whose correctness I would question, appears to me to be sufficiently fact-specific as to have little compulsive force as precedent, although I concede that it does push us in the direction taken by the court. In the end, I will concur in the judgment, but I dissent from that portion of the opinion relying upon the "reasonableness" of the representation made in the determination of agency.

HENDERSON, *Circuit Judge*, concurring:

I agree with my colleagues that "[g]iven the high level of deference" we accord the certification decision of the National Labor Relations Board (Board) as well as the impossibility standard by which the Board assesses a challenge to a union election based on third-party conduct, we should uphold the Board. Majority Op. at 14; *see also N. Am. Enclosures, Inc. v. NLRB*, 213 F. App'x 2, 4 (D.C. Cir. 2007) ("[T]he Board's union certification decision may be overturned [] if the activities of union supporters created an atmosphere of fear and coercion rendering a free and fair election impossible."). I write separately, however, to question whether our hands-off approach has provided these employees with a free and fair opportunity to choose their collective bargaining representative as guaranteed by the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.*

First, Jennings Brown and his lieutenants engaged in unrelenting thuggery, harassment and job-loss threats which may not have made an untainted election *impossible*, but certainly affected the result of the razor-thin Union victory. At least nine employees heard the job-loss statements, and, as noted by the Chief Judge, at least three of them "were so convinced of the reasonableness of the proposition that the union could get them fired that they sought reassurance from management." Concurrence at 1 (Sentelle, C.J.). While we may never know "how many other employees may have heard the statements but not sought reassurance," *id.*, we do know that if just three employees had changed their vote, the election would have come out differently (56 votes for the Union, 51 votes against the Union, one challenged ballot).

Second, while I agree that "nothing in the record suggests either the Union or Brown and his colleagues had special leverage with the Company that would permit them to effectuate [the job-loss] threats," Majority Op. at 7, fellow employees can have a "hereafter" effect on the results of an

election. Whether the Union wins or loses, beginning the day after the election, a threatened employee will still have to deal with his harasser.

Finally, I echo the Chief Judge's caution regarding our treatment of the agency issue, especially our endorsement of *Davlan Engineering*, 283 N.L.R.B. 803 (1987). In my view, when the Board concluded in *Davlan* that an employee who solicits authorization cards is a special agent for the "limited purpose of assessing the impact of statements about union fee waivers or other purported union policies [he] make[s] in the course of soliciting," 283 N.L.R.B. at 804, it unnecessarily limited the scope of the employee's agency and in turn expanded the Board's application of the ill-begotten impossibility standard.

In short, while I cannot say that the Board's certification is arbitrary in light of our standard of review, I believe the Board's impossibility standard and our deference to it lead to a dubious result. If the standard is not met here—where numerous pro-Union employees repeatedly intimidated enough colleagues to affect the election—then this case casts serious doubt on the efficacy of the impossibility standard to preserve the "laboratory conditions" necessary "to determine the uninhibited desires of the employees." *Serv. Corp. Int'l v. NLRB*, 495 F.3d 681, 684 (D.C. Cir. 2007) (quotation marks, alteration and citation omitted).