HENDERSON, Circuit Judge,
concurring:
I agree with my colleagues that “[gjiven the high level of deference” we accord the certification decision of the National Labor Relations Board (Board) as well as the impossibility standard by which the Board assesses a challenge to a union election based on third-party conduct, we should uphold the Board. Majority Op. at 117, see also N. Am. Enclosures, Inc. v. NLRB, 213 Fed.Appx. 2, 4 (D.C.Cir.2007) (“[T]he Board’s union certification decision may be overturned [] if the activities of union supporters created an atmosphere of fear and coercion rendering a free and fair election impossible.”). I write separately, however, to question whether our hands-off approach has provided these employees with a free and fair opportunity to choose their collective bargaining representative as guaranteed by the National Labor Relations Act, 29 U.S.C. §§ 151 et seq.
First, Jennings Brown and his lieutenants engaged in unrelenting thuggery, harassment and job-loss threats which may not have made an untainted election impossible, but certainly affected the result of the razor-thin Union victory. At least nine employees heard the job-loss statements, and, as noted by the Chief Judge, at least three of them “were so convinced of the reasonableness of the proposition that the union could get them fired that they sought reassurance from management.” Concurrence at 118 (Sentelle, C.J.). While we may never know “how many other employees may have heard the statements but not sought reassurance,” id., we do know that if just three employees had changed their vote, the election would have come out differently (56 votes for the Union, 51 votes against the Union, one challenged ballot).
Second, while I agree that “nothing in the record suggests either the Union or Brown and his ■ colleagues had special leverage with the Company that would permit them to effectuate [the job-loss] threats,” Majority Op. at 114, fellow employees can have a “hereafter” effect on the results of an election. Whether the Union wins or loses, beginning the day after the election, a threatened employee will still have to deal with his harasser.
Finally, I echo the Chief Judge’s caution regarding our treatment of the agency issue, especially our endorsement of Davlan Engineering, 283 N.L.R.B. 803 (1987). In my view, when the Board concluded in *119 Davlan that an employee who solicits authorization cards is a special agent for the “limited purpose of assessing the impact of statements about union fee waivers or other purported union policies [he] make[s] in the course of soliciting,” 283 N.L.R.B. at 804, it unnecessarily limited the scope of the employee’s agency and in turn expanded the Board’s application of the ill-begotten impossibility standard.
In short, while I cannot say that the Board’s certification is arbitrary in light of our standard of review, I believe the Board’s impossibility standard and our deference to it lead to a dubious result. If the standard is not met here — where numerous pro-Union employees repeatedly intimidated enough colleagues to affect the election — then this case casts serious doubt on the efficacy of the impossibility standard to preserve the “laboratory conditions” necessary “to determine the uninhibited desires of the employees.” Serv. Corp. Int’l v. NLRB, 495 F.3d 681, 684 (D.C.Cir.2007) (quotation marks, alteration and citation omitted).